UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


NUGENT SAND COMPANY,

       Plaintiff,

                                     File No.  1:05-CV-599

v.

                                     HON. ROBERT HOLMES BELL

CENTURY INDEMNITY COMPANY,
as successor to Insurance Company of
North America, et al.

       Defendants.

_____/

## O P I N I O N

      This matter is before the Court on the parties' cross-motions for summary judgment as to the absolute pollution exclusion in each of the insurance policies.  Defendants Commercial Union Insurance Company, Continental Insurance Company and Century Surety Company[1] (the "Insurance Companies") contend that the absolute pollution exclusion in each of the policies applies to the underlying claim, so there is no duty to defend or to indemnify. Nugent Sand Company ("Nugent") contends that the absolute pollution exclusion in each of

---

[1] The Century Surety Company that filed a motion for summary judgment is distinct from the first party listed on the caption, Century Indemnity Company.  The Court notes this here because there was some confusion about the distinction between the two companies at the hearing on this motion.

the policies does not apply, so there is a duty to defend and to indemnify.[2]  For the reasons

that follow, the Court grants the Insurance Companies' motions for summary judgment and

denies Nugent's cross-motion for summary judgment.[3]

I.

Nugent sells high-grade processed sand for use in a variety of commercial

applications.  Nugent operates on a 440-acre site near Norton Shores, Michigan.  The 440-

acre site has two man-made lakes, North Lake and South Lake.  Nugent dredges North Lake

to obtain the sand.  The sand contains natural impurities which Nugent removes to produce

the high-grade processed sand.  During the first phase of the sand washing process, surface

water from North Lake is mixed with sand dredged from the bottom of North Lake and the

sand/water slurry is then put through a desliming process.  The second phase of the sand

washing process removes carbonates.  During the second phase of the sand washing process

Nugent adds fatty acid[4] and pine oil to the sand/water slurry.  The carbonates, fatty acid and

_____

[2] The Insurance Companies allege that Nugent's motion for summary judgment was untimely because it was filed on September 18, 2006.  The Court's May 22, 2006 Case Management Order, (Docket #74), did establish a deadline of August 18, 2006 for the filing of dispositive motions, however, that deadline only applied to Defendants.  So Nugent's motion was timely, and therefore will be considered by the Court on the merits.

[3] Defendant Mt. Hawley Insurance Company ("Mt. Hawley") also filed a motion for summary judgment (Docket #114).  However, Nugent and Mt. Hawley have since settled and Nugent's claims against Mt. Hawley have been dismissed with prejudice.  (Oct. 25, 2006 Order Granting Stipulation, Docket #140, at 2.)  Therefore, Mt. Hawley's motion for summary judgment is denied as moot.

[4] The trade name of the fatty acid used by Nugent has varied, but the predominant trade name was Pamak.  The Court refers to the fatty acid as fatty acid, instead of using one or more the different trade names.

pine oil then float to the surface of the slurry water.  The carbonates, fatty acid and pine oil are skimmed off and discharged into the southeast portion of North Lake.

On September 19, 2003 after monitoring wells showed elevated levels of iron and manganese, Nugent sent a "Notice of Migration of Contamination" to property owners adjacent to its operations.  The Notice of Migration advised the property owners that there were hazardous levels of iron and manganese in the groundwater.  The Notice identified Pamak, the fatty acid, as the alleged cause.  On April 5, 2004 a suit was filed against Nugent in the Muskegon County Circuit Court for the increased levels of iron and manganese in the groundwater near its facility, the suit was captioned *Idlewild Protection Association, et al. v. The Nugent Sand Company, Inc.* ("*Idlewild* lawsuit").  The *Idlewild* lawsuit alleged that Nugent discharged wastewater containing Pamak and that "[t]hrough a series of chemical and/or biological reactions, the compounds in the discharged water cause[d] the release of iron and manganese, as well as other substances, into the groundwater."  (*Idlewild* Lawsuit - First Am. Compl.¶ 22, Commercial Union's Br., Docket #109, Ex. 7.)  Nugent settled the *Idlewild* lawsuit by agreeing to make a one-time payment of approximately $120,00 and to pay to connect the *Idlewild* plaintiffs to a public water supply.  Nugent now seeks to recoup $463,000, based on the cost of settling and defending the *Idlewild* lawsuit.

As to the connection between the fatty acid and the increased levels of iron and manganese, the Michigan Department of Environmental Quality ("MDEQ") concluded "that the addition of the Pamak to the water, then indirectly or, in this case directly led to an

increase of anerobic [*sic*] bacteria.  And it was the activity of the anerobic [*sic*] bacteria that mobilized the iron and manganese, . . . and caused the situation in the groundwater." (Janiczek Dep. 33:8-1316, Cont'l Ins.' Br., Docket #111, Ex. 4.)

II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If Defendants carry their burden of showing there is an absence of evidence to support a claim, then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories and admissions on file, that there is a genuine issue of material fact for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party.  *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587).  Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is whether the evidence is such

4

that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally*, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

The standards upon which the Court evaluates a motion for summary judgment do not change simply because the parties present cross-motions. *B.F. Goodrich Co. v. U.S. Filter Corp.* 245 F.3d 587, 593 (6th Cir. 2001). "'The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts.'" *Taft Broadcasting Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

III.

**A. Michigan Insurance Law**

The interpretation of an insurance policy is a question of law. *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47, 664 N.W.2d 776 (2003). Michigan considers an insurance policy to be a contract, subject to the general rules of interpretation that apply to all other contracts, not a special set of rules unique to insurance policies. *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 461, 703 N.W.2d 23 (2005). "'The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate.'" *City of Grosse Pointe Park v. Mich. Mun. Liab. & Prop. Pool*, 473 Mich. 188, 197, 702 N.W.2d 106 (2005) (quoting *McIntosh v Groomes*, 227 Mich. 215, 218, 198 N.W. 954 (1924)). The language

5

of the parties "is the best way to determine what the parties intended." *Klapp v. United Ins.*

*Group Agency, Inc.*, 468 Mich. 459, 476, 663 N.W.2d 447 (2003).  If the parties' intent

cannot be ascertained from the language of the contract, "the *next* best way to determine the

parties' intent is to use relevant extrinsic evidence." *Id.* (emphasis in original).  If an insurer

asserts that a claim is within an exclusion to the policy, then the burden is on the insurer to

prove that the exclusion to coverage is applicable.  *Heniser v. Frankenmuth Mut. Ins.*, 449

Mich. 155, 161 n.6, 534 N.W.2d 502 (1995); *Morrill v. Gallagher*, 370 Mich. 578, 587, 122

N.W.2d 687 (1963).

### B.  Analysis of the Absolute Pollution Exclusions

#### 1.  The Policy Language

The relevant part of the Century Surety policy provides that:

2. Exclusions.
This insurance does not apply to:
 . . .
f.  Pollution
(1) "Bodily injury" or "property damage" which would not have occurred in
whole or part but for the actual, alleged or threatened discharge, dispersal,
seepage, migration, release or escape of pollutants at any time.
. . .
(2) Any loss, cost or expense arising out of any:
        (a) Request, demand or order that any insured or others test for,
        monitor, clean up, remove, contain, treat, detoxify or neutralize,
        or in any way respond to, or assess the effects of pollutants . . . .

(Commercial Gen. Liab. Coverage Form, Century Surety's Br., Docket #115, Ex. A, at 16-

17.)  As used in the policy, "[p]ollutants means any solid, liquid, gaseous or thermal irritant

or contaminant, including, smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste and

petroleum products."  (*Id.* at 17.)

The relevant part of the Commercial Union policy provides that:

2. Exclusions
This insurance does not apply to:
 . . .
f. Pollution.
(1) "Bodily injury" and "property damage" arising out of the actual, alleged,
or threatened discharge, dispersal, seepage, migration, release or escape of
pollutants:
 (a) At or from any premises, site or location which is or was at
 any time owned or occupied by, or rented or loaned to, any
 insured . . . .

(Commercial Gen. Liab. Coverage Form, Commercial Union's Br., Ex. 2, at 42-43.)  As used

in the policy, "[p]ollutants means any solid, liquid, gaseous or thermal irritant or

contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  (*Id.*

at 43.)

The relevant part of the Continental Insurance policy provides:

This insurance does not apply to:
(1) "Bodily injury" or "property damages" arising out of the actual, alleged or
threatened emission, discharge, dispersal, seepage, migration, release or escape
of "pollutants":
 (a) At or from any premises, site or location which is or was at
 any time owned or occupied by, or rented or loaned to any
 insured . . . .

(Pollution Exclusion Endorsement with Hostile Fire Amend., Cont'l Ins.' Br., Ex. 22, at 2.)

The policy defines "pollutants" as:

> "Pollutants" means any noise, solid, semi-solid, liquid, gaseous or thermal irritant or contaminant, including, smoke, vapor, soot, fumes, mists, acids, alkalis, chemicals, biological and etiologic agents or materials, electromagnetic or ionizing radiation and energy, genetically engineered materials, teratogenic, carcinogenic and mutagenic materials, "waste" and any irritant or contaminant.

(*Id.*)   As referred to in the insurance industry, each of the policies contain an absolute pollution exclusion. *See McGuirk Sand & Gravel v. Meridian Mut. Ins. Co.*, 220 Mich. App. 347, 353-54, 559 N.W.2d 93 (1996) (reviewing the history of absolute pollution exclusions in the insurance industry).   As applied to the facts of this case, the absolute pollution exclusions are sufficiently identical that the Court will analyze them collectively, without distinguishing between the three exclusions.

### 2. Whether the Absolute Pollution Exclusions are Unambiguous

Exclusions from coverage, when ambiguous, are construed against the insurance company and in favor of coverage. *Wilkie*, 469 Mich. at 51; *Auto-Owners Ins. Co. v. Churchman*, 440 Mich. 560, 567, 489 N.W.2d 431 (1992). "Clear and specific exclusionary clauses must be given effect, but are strictly construed in favor of the insured." *McKusick v. Travelers Indem. Co.*, 246 Mich. App. 329, 333, 632 N.W.2d 525 (2001).   The question of whether an insurance contract is ambiguous is a question of law. *Wilkie*, 469 Mich. at 47.

"If a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous . . . ." *Farm Bureau Mut. Ins. Co. v. Nikkel*, 460 Mich. 558, 566, 596 N.W.2d 915 (1999).

Michigan courts have repeatedly held absolute pollution exclusions, very similar to those at issue in this case, to be unambiguous. *E.g., City of Grosse Pointe Park*, 473 Mich. at 203; *Protective Nat'l Ins. Co. of Omaha v. City of Woodhaven*, 438 Mich. 154, 161-62, 476 N.W.2d 374 (1991); *McGuirk Sand*, 220 Mich. App. at 353-54; *U.S. Fire Ins. Co. v. City of Warren*, 87 Fed. App'x 485, 489 (6th Cir. 2003). The absolute pollution exclusions at issue are only susceptible to a single fair reading, so the absolute pollution exclusions are clear and unambiguous. Contrary to Nugent's argument, the existence of a second reading alone is not sufficient to make the exclusions ambiguous. If the second reading is not a fair reading, then the exclusions are still unambiguous.

Nugent argues that the Michigan cases finding absolute pollution exclusions to be unambiguous are distinguishable because they did not involve "a chain reaction in the environment." (Nugent's Br., Docket #119, at 22.) Nugent's distinction is not consistent with a fair reading of the absolute pollution exclusions. The flaw in Nugent's chain reaction argument is illustrated by the application of Nugent's theory to the facts of *Gulf Insurance Co. v. City of Holland*, No. 1:98-CV-774, 2000 U.S. Dist. Lexis 19602 (W.D. Mich. Apr. 3, 2000) (Quist, J.). In *Gulf Insurance Co.*, a delivery of bleach was made to the wrong facility, upon arriving at the wrong facility the driver of the tanker transporting the bleach began to unload the bleach. *Id.* at *2-3. The driver unloaded the bleach into a tank containing aluminum sulfate. *Id.* at *3-4. The bleach reacted with the aluminum sulfate to create chlorine gas. *Id.* The underlying injuries for which the insured sought indemnity were

caused by the chlorine gas, not the bleach.  *Id.* at *4.  The court in *Gulf Insurance Co.* held that the absolute pollution exclusion in the policy was unambiguous and applicable, so there was no duty to indemnify.  *Id.* at *11-18.  If Nugent's chain reaction analysis was applied to *Gulf Insurance Co.,* there would have been a duty to indemnify because the chlorine gas was the result of a reaction between the bleach and the aluminum sulfate.  This is fatal for Nugent's purported distinction because Nugent's analysis precludes an absolute pollution exclusion from applying to facts that are clearly within the terms of the absolute pollution exclusion.  If a company mixes two chemicals and as a result the discharge of a third substance, which is a "pollutant," occurs, that discharge is within the terms of the absolute pollution exclusion.  In consideration of this, Nugent's "chain reaction" argument does not provide a basis for distinguishing the prior cases finding absolute pollution exclusions unambiguous.

Nugent's cross-motion for summary judgment was premised on the absolute pollution exclusions being ambiguous.  Nugent further argued that if the exclusions were ambiguous then they must be construed against the Insurance Companies and in favor of Nugent.  The Court has found the exclusions to be unambiguous, therefore Nugent's cross-motion for summary judgment is denied.

### 3.  When the "Pollutant" Classification Should be Made

Under the definitions of "pollutant" in the policies, the fatty acid was a "pollutant" if it was a "contaminant," an "irritant" or "waste."  Nugent, relying primarily on *Protective*

*National*, argues that the Court's determination of whether the fatty acid was a "pollutant" must be determined as of the time that the substance was released into the environment, without consideration of subsequent events. Nugent's argument fails because *Protective National* does not stand for a broad general rule that the classification of something as a "pollutant" must only consider the time of release. The underlying claim in *Protective National* involved a plaintiff who had been inadvertently exposed to a pesticide. 438 Mich. at 156. The release of the pesticide had been intentional, but an unexpected wind blew the pesticide onto the plaintiff. *Id.* at 162-63. The pollution exclusion in *Protective National* had an exception that restored coverage if the "discharge, dispersal, or escape is sudden and accidental." *Id.* at 161. The Michigan Supreme Court held that the provision restoring coverage looked at the initial release, not at subsequent events. *Id.* at 162. So if the initial release was intentional, then a subsequent accident could not restore coverage. Applying this rule the Michigan Supreme Court held that the pollution exclusion barred recovery under the insurance policy. *Id.* at 163. The Michigan Supreme Court in *Protective National* grounded its analysis in the "sudden and accidental" language in the coverage restoration provision. *Id.* at 162-63. Thus, the analysis in *Protective National* suggests that it should be limited to cases involving policies with language addressed to "sudden and accidental" releases. *See Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 232 Mich. App. 146, 154, 594 N.W.2d 61 (1998) ("When determining whether a discharge is 'sudden and accidental,' the focus is on the initial entry of the pollutants into the environment, and not the subsequent migration of

11

the pollutants after their release." (citing *Protective Nat'l*, 438 Mich. at 161-62));

*Progressive Architects /Engineers /Planners v. Security Ins. Co.*, No. 1:93-CV-539, 1994

U.S. Dist. LEXIS 11589, at *16-17 (W.D. Mich. July 18, 1994) (Miles, J.), (finding

*Protective National* inapplicable because the policy did not have a "sudden and accidental"

exception), *aff'd on other grounds* 1996 U.S. App. LEXIS 33235, at *6-8 (6th Cir. 1996).

Nugent also argues that the text of each exclusion limits the inquiry to the time of the

initial release.  To the extent that Nugent argues that the substance released by the insured

must be classified as a "pollutant," Nugent is correct.  This requirement is dictated by the

language in the policies which state: "discharge, dispersal, seepage, migration, release or

escape of pollutants."  This language limits the question to whether what the insured

discharged or was alleged to have discharged was a "pollutant."  However, the question of

whether a substance is a "pollutant" must consider the reaction of the substance with the

environment.  The question of whether something is a "contaminant" and therefore a

"pollutant" necessitates consideration of whether the substance has made the substance into

which it was discharged impure.  *See City of Gross Pointe Park*, 473 Mich. at 215 (defining

contaminant);  *see also infra* Part III.B.4.  So to determine whether something is a

"contaminant" requires consideration of how that substance reacts with the environment.

Thus, it is appropriate for the Court to consider the reactions in the environment after Nugent

discharged the fatty acid.

### 4. Classifying the Fatty Acid as a "Contaminant" or "Irritant"

Under Michigan law, a court interprets the terms of insurance contract in accordance with their "commonly used meaning." *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 112, 595 N.W.2d 832 (1999). The three pollution exclusions all define "pollutant" to include "any . . . contaminant." A "contaminant" is "something that contaminates." *City of Gross Pointe Park*, 473 Mich. at 215 (quoting *Random House Webster's College Dictionary* (1995)). In the context of a pollution exclusion the Michigan Supreme Court defined contaminates as: "to make impure or unsuitable by contact or mixture with something unclear, bad, etc.; pollute; taint . . . ." *Id.*

The fatty acid made the groundwater of the *Idlewild* plaintiffs "impure" by increasing the levels of iron and manganese. The fact that the fatty acid reacted with the anaerobic bacteria does not alter the fact that the fatty acid made the water impure. Moreover, there is nothing in the definition of "contaminant" which suggests that the change must be instantaneous. Thus, under the definition used in *City of Gross Pointe Park*, the fatty acid made the groundwater impure and therefore the fatty acid was a "contaminant" within that term's meaning in the policies.

Nugent responds by arguing that the *Idlewild* complaint did not allege that the fatty acid had contaminated the groundwater. The language of the *Idlewild* complaint is to the contrary. The *Idlewild* complaint states that Nugent's "past discharges have polluted the groundwater, and their discharges will continue to pollute the groundwater for a period of

13

years . . . . " (*Idlewild* Lawsuit - First Am. Compl.¶ 37.) Though the *Idlewild* complaint does not explicitly refer to the fatty acid as pollution, the complaint does refer to Nugent's discharges as pollution and what Nugent was discharging was fatty acid. This alone is sufficient for the fatty acid to be considered a "pollutant" because each of the pollution exclusions is applicable to an "alleged . . . discharge . . . of pollutants." Therefore, Nugent's argument about the *Idlewild* complaint is unavailing.

Nugent also argues that the fact that the MDEQ did not limit the amount of fatty acid that it could discharge indicates that the fatty acid was not an "irritant" or "contaminant." However, the Groundwater Discharge Permit issued by the MDEQ did limit the amount of "process wastewater containing Pamak" that Nugent could discharge. (2004 Groundwater Discharge Permit 1, Nugent's Br., Ex. C.) The intent of this provision to limit the discharge of Pamak is made clear by the next provision in the permit, which provides a limit on the amount of wash water without additives that can be discharged per day. (*Id.*) The MDEQ specifically limited that amount of water containing Pamak that Nugent was permitted to discharge. Though the permit does not refer to Pamak as an "irritant" or "contaminant," the limit on the amount that can be discharged is consistent with Pamak being a "contaminant."

The Material Safety Data Sheet ("MSDS") for Pamak indicates that Pamak "may cause eye and skin irritation. Repeated contact may cause skin sensitization." (MSDS - Pamak, Commercial Union's Br., Ex. 3, at 1.) Under the heading of "Accidental Release Measures" the MSDS states: "Prevent runoff from entering drains, sewers, or streams." (*Id.*

14

at 6.)  The Insurance Companies argue that these support classifying the fatty acid as a "pollutant." Nugent argues that the MSDS is not relevant for two reasons.  First, Nugent argues that the MSDS statements are not relevant because the MSDS statements express concerns different from those found in the *Idlewild* complaint.  Second, Nugent argues that the MSDS statements are inapplicable because they refer to the undiluted fatty acid, while Nugent discharged a highly diluted form of the fatty acid.  As to Nugent's first argument, the distinction Nugent is trying to make is not relevant.  If the fatty acid was a "pollutant," then any harm it caused through reactions with the environment is excluded by the absolute pollution exclusion, even if it was not the typical harm.[5]  As to Nugent's second argument, Nugent has not explained why the dilution of a substance should change how it is classified for purposes of the absolute pollution exclusion.  Distinguishing a substance based on the level of dilution implicitly concedes that at high concentrations the substance is a "contaminant."  This means that if the fatty acid was discharged in an undiluted form, then the fatty acid would be a "pollutant."   Though dilution may minimize or change the harm, so long as the substance was discharged in a form that would cause some reaction in the environment, then the concentration level is sufficient to classify the substance as a "pollutant."  Retaining the ability to react with the environment means that the substance still retains the ability to make something impure.

---

[5]  To be clear, the absolute pollution exclusion would not apply if someone spilled the fatty acid and then someone slipped and fell as a result.

Nugent further argues that the prior cases interpreting absolute pollution exclusions are all distinguishable because they involved substances (e.g., sewage, petroleum and chlorine gas) "properly" classified as "irritants and contaminants." (Nugent's Br. 19-20.) Beyond the three identified substances, Nugent never explains what determines whether something is "properly" classified as an "irritant" or "contaminant." Nugent seems to be attempting to limit the definition of "irritants" and "contaminants" to the types of pollution traditionally associated with heavy industry. The absolute pollution exclusions, however, make no such distinctions. Like the absolute pollution exclusion at issue in *McGuirk Sand*, the absolute pollution exclusions before the Court define "pollutant" without qualification. 220 Mich. App. at 356 ("The policy defines 'pollutant' without qualification, i.e., as 'any . . . liquid . . . contaminant.'"). This eliminates any basis for Nugent's proffered requirement that the absolute pollution exclusions be limited to the substances traditionally associated with heavy industry. Additionally, in Michigan absolute pollution exclusions have not been limited to hazardous substances. *E.g.*, *Aetna Casualty & Surety Co. v. Dow Chemical Co.*, 933 F. Supp. 675, 684 (E.D. Mich. 1996) (Edmunds, J.) (applying Michigan law and holding that a "pollution exclusion clause includes nonhazardous wastes").

The fatty acid discharged by Nugent was a "pollutant" within that term's meaning in the absolute pollution exclusions. As such, the absolute pollution exclusions operate to bar coverage. Therefore, the Insurance Companies do not have a duty to indemnify.

16

IV.

Nugent argues that even if the there was not a duty to indemnify, there was a duty to

defend.  In Michigan "[i]f the policy does not apply, there is no duty to defend."  *Am. Bumper*

*& Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450, 550 N.W.2d 475 (1996) (citing

*Protective Nat'l*, 438 Mich. at 159).   The Michigan Supreme Court has explained the

relationship between the two duties as:

> the scope of the two duties is not identical; the duty to defend is broader than
> the duty to indemnify.   If the allegations of a third party against the
> policyholder even arguably come within the policy coverage, the insurer must
> provide a defense. This is true even where the claim may be groundless or
> frivolous.

*Am. Bumper*, 452 Mich. at 450-51 (citations omitted).  The duty to defend arises if there are

any theories of recovery in the underlying action which fall within the policy.  *Am. Bumper*,

452 Mich. at 451-52.  Nugent bases the existence of a duty to defend on the argument that

the *Idlewild* lawsuit was at least "arguably" within the policy coverage and so the insurance

companies had a duty to defend.  Nugent's argument misunderstands the use of "arguably"

in *American Bumper*.  The Michigan Supreme Court's analysis of "arguably" in *American*

*Bumper* focused on the duty to defend in terms of the merits of the underlying suit.  452

Mich. 451 n.12 (discussing the duty to defend "groundless" suits).  Thus, the duty to defend

is broader than the duty to indemnify in that an insurance company could be required to

defend a meritless suit.  *Id.*  Additionally, the duty to defend can arise when the facts are

insufficiently developed.  *Id.* at 451-52. Effectively this means that if the facts could

reasonably be expected to develop such that there is a duty to indemnify, then there is a duty to defend until such factual development resolves the question of indemnification.  *Id.*  at 453-54.

There has been no suggestion that this suit falls within the duty to defend as it arises in the context of meritless suits.  As to factual development, the theory of the *Idlewild* lawsuit was sufficiently developed at the time it was tendered to the Insurance Companies.  There was no prospect of additional facts bringing the cause of the increased iron and manganese levels within the insurance policies.  The theory about the increased iron and manganese levels has largely remained unchanged from the theory that Nugent attributed to the MDEQ in the Notice of Migration.  Therefore, the Insurance Companies did not have a duty to defend.

## V.

For the foregoing reasons, the Insurance Companies' motions for summary judgment are granted and Nugent's cross-motion for summary judgment is denied.  A judgment will be entered consistent with this opinion.


Date:   November 16, 2006            /s/ Robert Holmes Bell
                                     ROBERT HOLMES BELL
                                     CHIEF UNITED STATES DISTRICT JUDGE